## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

AMANDA KIMBERLY ARAGON,

      Plaintiff,

      vs.                           CIV No. 21-977 KK

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,

      Defendant.

### MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court upon Plaintiff's Motion to Reverse and Remand for Rehearing, with Supporting Memorandum (Doc. 24), dated July 18, 2022, challenging the determination of the Acting Commissioner of the Social Security Administration ("the Commissioner") that Plaintiff is not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. On September 15, 2022, the Commissioner filed a response, and on October 3, 2022, Plaintiff filed a reply. (Docs. 25; 26.) The Court has thoroughly reviewed the administrative record, the parties' briefs, and the relevant law, and for the reasons set forth below, finds that Plaintiff's motion is not well-taken and will be DENIED.

### I. BACKGROUND AND PROCEDURAL POSTURE

Amanda Kimberly Aragon ("Plaintiff") filed this action under 42 U.S.C. § 405(g), seeking reversal of the Commissioner's decision denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.) She filed her initial application for DIB in August 2019, alleging that she became disabled on August 1, 2018, due to auto immune disease,

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to have the undersigned conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 17.)

migraines, depression, poor sleep, back injury, neck injury, anxiety, and extreme fatigue. (AR 59, 153-54.[2]) Plaintiff's application was denied at the initial level on September 30, 2019 (AR 58-69), and at the reconsideration level on May 14, 2020 (AR 70-84). Plaintiff requested a hearing (AR 98-99), which ALJ Jennifer Fellabaum conducted telephonically on February 23, 2021 (*see* AR 31-57). Plaintiff was represented by counsel and testified at the hearing, as did vocational expert Leslie White (the "VE"). (AR 31-57.)

On March 17, 2021, the ALJ issued her decision, finding that Plaintiff was not disabled under the relevant sections of the Social Security Act. (AR 13-25). Plaintiff requested that the Appeals Council review the ALJ's decision (AR 8-9), and on August 12, 2021, the Appeals Council denied the request for review (AR 2-7), which made the ALJ's decision the final decision of the Commissioner. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). On October 7, 2021, Plaintiff filed the Complaint in this case seeking review of the Commissioner's decision. (Doc. 1.)

## II.  LEGAL STANDARDS

### A.  Standard of Review

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does

---

[2] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on March 3, 2022. (Doc. 14.)

not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation omitted). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (quotation omitted) or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) (citation omitted). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citation omitted).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks, brackets, and citation omitted omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996) (citations omitted). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

## B.  Disability Framework

"Disability," as defined by the Social Security Act, is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration ("SSA") has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051-52 (10th Cir. 2009); 20 C.F.R. § 404.1520. If a finding of disability or non-disability is directed at any point, the SSA will not proceed through the remaining steps. *See Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of her impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a). At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25. If the claimant meets "the burden of establishing a prima facie case of disability[,] . . . the burden of proof shifts to the Commissioner at step five to show that" the claimant retains sufficient RFC "to perform work in the national economy, given [her] age, education and work experience." *Grogan*, 399 F.3d at 1261 (citation omitted); *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## III.  THE ALJ'S DETERMINATION

The ALJ reviewed Plaintiff's DIB claim pursuant to the five-step sequential evaluation process. (AR 13-25.) First, ALJ Fellabaum found that Plaintiff met the SSA's insured status

requirements through the relevant period and had not engaged in substantial gainful activity since

August 1, 2018, the alleged onset date. (AR 15.) The ALJ found at step two that Plaintiff suffered

from the severe impairments of migraines, degenerative disc disease, depression, anxiety, and

fibromyalgia. (AR 15.) At step three, the ALJ concluded that Plaintiff did not have an impairment

or combination of impairments that met or medically equaled the criteria of listed impairments

under Appendix 1 of the SSA's regulations. (AR 15.)

Moving to the next step, the ALJ reviewed the evidence of record, including medical

opinions and evidence from treating and consulting providers, prior administrative medical

findings, and Plaintiff's own subjective symptom evidence. (*See* AR 17-23.) Having done so, the

ALJ concluded that for the relevant period, Plaintiff possessed an RFC to

> perform light work as defined in 20 [C.F.R. §] 404.1567(b) except she can
> occasionally climb ramps and stairs, stoop, crouch, kneel, and crawl; can never
> climb ladders, ropes, or scaffolds, or be exposed to unprotected heights, hazardous
> machinery, or concentrated exposure to environmental irritants; can frequently
> finger and handle bilaterally; noise level of the work environment should be
> moderate or less; can occasionally interact with the general public; and her work
> should be performed in the same location every day.

(AR 17-18.) Based on this RFC, the ALJ found that Plaintiff was capable of performing her past

relevant work as an order clerk. (AR 23.)

Alternatively, at step five, the ALJ determined that "there are other jobs that exist in

significant numbers in the national economy that [Plaintiff] also can perform . . . ." (AR 24). The

ALJ therefore concluded that Plaintiff "has not been under a disability, as defined in the Social

Security Act, from August 1, 2018, though the date of [the ALJ's] decision." (AR 25.)

## IV.  DISCUSSION

Plaintiff contends that the ALJ failed to properly assess the opinion of her treating

rheumatologist (Doc. 24 at 5-9), failed to properly evaluate her fibromyalgia, migraines, anxiety,

depression, and gastrointestinal symptoms (*id.* at 10-18), failed to consider lay opinion evidence from her father (*id.* at 18-19), failed to adequately account for her subjective symptoms (*id.* at 19-21), failed to clarify the duties of her past work (*id.* at 22-23), failed to pose a properly-formed hypothetical question to the VE (*id.* at 23-26), and failed to resolve inconsistencies in the VE's testimony (*id.* at 24-26). Of Plaintiff's ten primary arguments and numerous sub-arguments, none have merit.

### A.  The ALJ properly evaluated the opinion of Plaintiff's treating rheumatologist.

First, Plaintiff contends that the ALJ failed to properly assess the opinion of Vijayalakshmi Kumar, M.D., her treating rheumatologist. (Doc. 24 at 5-9.) The opinion to which Plaintiff refers is Dr. Kumar's brief letter dated January 5, 2021. (*See* Doc. 24 at 6 (citing AR 615).) Therein, Dr. Kumar indicated that Plaintiff was under her care "for abnormal immunology findings" and opined that Plaintiff's "diagnosis can cause painful flare ups that can last [a] few days [and] requires patient to rest." (AR 615.) Dr. Kumar wrote that Plaintiff was "currently being observed as well as having blood work every few months to better monitor her condition." (AR 615.)

Because Plaintiff applied for disability benefits after March 27, 2017, the ALJ was required to evaluate Dr. Kumar's medical opinions under the revised regulation found in 20 C.F.R. § 404.1520c. *See Zhu v. Comm'r, SSA*, No. 20-3180, 2021 WL 2794533, at *4 & n.8 (10th Cir. July 6, 2021). This revised regulation does not assign any specific evidentiary weight or deference to medical opinions, including those of treating physicians. *See* 20 C.F.R. § 404.1520c(a). It does, however, impose certain "articulation requirements" on an ALJ in her evaluation of medical opinions. *See id.* § 404.1520c(b). First, the regulation provides that "when a medical source provides multiple medical opinion(s)," the ALJ need not articulate how she considered each individual medical opinion; she need only "articulate how [she] considered the medical

opinions . . . from that medical source together in a single analysis . . . ." *Id.* § 404.1520c(b)(1). Second, an ALJ must consider five factors when evaluating medical opinion evidence, *see id.* § 404.1520c(c)(1)-(5); however, she is generally only required to *articulate* her consideration of two of those factors: supportability and consistency. *Id.* § 404.1520c(b)(2). Third and finally, if differing medical opinions are equally well-supported and consistent with the record, the ALJ must then "articulate how [she] considered the other most persuasive factors . . . for those medical opinions[,]" including the source's relationship with their client, any specialization, and other factors that tend to support or contradict the medical opinion. *Id.* §§ 404.1520c(b)(3); 404.1520c(c)(3)-(5).

While the revised regulation allows the ALJ some discretion in *how* she articulates her findings as to the persuasive value of medical opinion evidence, it provides no leeway as to *whether* she articulates such findings. *See id.* § 404.1520c(b) (providing that the ALJ "***will*** articulate in [her] determination or decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record") (emphasis added). In other words, while an ALJ generally "is not required to discuss every piece of evidence," *see Clifton*, 79 F.3d at 1009-10, the duty to address the persuasive value of *all* medical opinion evidence of record—at least at the source level—is mandatory. *See id*. The new regulation does not alter the standard of review, however. Thus, an ALJ's persuasiveness finding "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (quotation omitted), or if it "constitutes mere conclusion[,]" *Musgrave*, 966 F.2d at 1374 (citation omitted). As before, an ALJ must "consider all relevant evidence in the case record[,]" *Silva v Saul*, No. 19-913 WJ/KK, 2020 WL 4220862, at *4 (D.N.M. July 23, 2020) (citations

omitted), and must provide the Court "with a sufficient basis to determine that appropriate legal principles have been followed[,]" *Jensen*, 436 F.3d at 1165 (quotation omitted).

Here, Plaintiff submits that the ALJ failed to adequately explain how she considered § 404.1520c's persuasiveness factors with respect to Dr. Kumar's opinions. (Doc. 24 at 5-9.) That is, despite her relatively detailed discussion of Dr. Kumar's medical treatment notes and her express finding that Dr. Kumar's opinion was "not entirely persuasive," Plaintiff maintains that ALJ Fellabaum failed to meet the applicable articulation standard. (Doc. 24 at 5-9 (citing 20 C.F.R. § 404.1520c(b).) At the very least, an ALJ must provide an explanation that allows the reviewing court to follow her reasoning and communicates how she considered the factors of consistency and supportability for each medical source's opinions. 20 C.F.R. § 404.1520c. Plaintiff does not argue that the ALJ failed altogether to address these requisite factors, but instead suggests that her "assessment is lacking and ignores the medical evidence of record." (*Id*. at 6.) To be sure, the ALJ's "explanation must at least '[e]schew[] rote analysis and conclusory explanations [and] discuss . . . the crucial factors in any determination with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence . . . ." *Frazer v. Kijakazi*, No. 20-1147 GBW, 2022 WL 682661, at *5 (D.N.M. Mar. 8, 2022) (quoting *Pamela P. v. Saul*, 3:19-CV-575 DJS, 2020 WL 2561106, at *5 (N.D.N.Y. May 20, 2020)) (subsequent citations omitted). With this guidance in mind, the Court considers the ALJ's analysis of the persuasive value of Dr. Kumar's opinions.

### 1.   *Supportability Factor*

The supportability factor considers how well a medical source supported her own opinions with "objective medical evidence" and "supporting explanations." 20 C.F.R. § 404.1520c(c)(1). "The more relevant the objective medical evidence and supporting explanations presented by a

medical source are to support . . . her medical opinion(s)[,] . . . the more persuasive the medical

opinions . . . will be." (*Id*.). Here, the ALJ's supportability findings are straightforward. She found

"limited explanation in [Dr. Kumar's] letter" and noted that Dr. Kumar neglected to "state any

specific functional limitations or how long or frequently [Plaintiff] would need to rest." (AR 23.)

She further found that "the level and frequency of treatment and objective findings in Dr. Kumar's

treatment record do not support days off work in her residual functional capacity." (AR 23.)

Plaintiff does not refute the ALJ's findings that Dr. Kumar offered limited explanation or

that she failed to delineate specific functional limitations. (*See* Doc. 26 at 2 ("[I]t is true Dr. Kumar

did not include specific lengths of time or the frequency at which [Plaintiff] would need to rest . .

. .").) She does, however, take issue with the finding that Dr. Kumar's treatment record does not

support her opinion. Plaintiff submits that, contrary to the ALJ's finding, Dr. Kumar's opinion was

"internally *supported* by [her own] objective and subjective findings[,] as she began treating

[Plaintiff] in October 2017 where it was noted she had a positive ANA, was suffering from

abnormal weight loss, hair loss, fatigue and paresthesia an[d] she had increased myalgias and

malaise." (Doc. 24 at 7 (citing AR 385-87)) (emphasis added).) Plaintiff goes on, explaining that

Dr. Kumar's treatment notes document the following:

> diffuse widespread myofascial pain issues, nonspecific arthralgia, myalgia, fatigue,
> nausea, insomnia, allodynia, hyperesthesia, headaches, paresthesias, night sweats,
> increasing morning stiffness, complaints of frequent swollen and tender glands and
> physical examination showing osteoarthritic changes of hands and knees, puffy
> hands and lab work indicating she has a positive anti-RNP antibody indicating
> possible mixed connective tissue disease.

(*Id*. (citing AR 394-97, 408-10, 417-20, 426, 541-44, 548-51, 593-95, 603-06).)

But the ALJ did not leave Dr. Kumar's examination findings unaddressed. Elsewhere in

her decision, she provided considerable detail regarding Dr. Kumar's treatment notes and objective

findings. For instance, she observed that Dr. Kumar had been seeing Plaintiff since October 2018,

with visits approximately every two to three months. (AR 19.) She discussed various medications Dr. Kumar prescribed for pain and highlighted her reports of improved symptoms on various medication regimens, including a "modest improvement with hydroxychloroquine by June 25, 2019, and "considerable improvement" with duloxetine and mirtazapine by February 2020. (AR 20-21; *see also* AR 426, 548.) The ALJ described Dr. Kumar's non-pharmaceutical recommendations as "fairly conservative," noting that she suggested "physical activity, aerobic exercise, Tai Chi, yoga, Pilates, etc. for myofascial pain[]" as well as "sleep hygiene," Vitamin D supplements, and dietary measures. (AR 20.) Finally, the ALJ recounted Dr. Kumar's findings, at numerous visits, that Plaintiff had no extremity edema or joint synovitis, normal joint range of motion, normal motor strength in the upper and lower extremities, and normal gait (AR 21-22; *see also* AR 397, 411, 420, 429, 544, 551, 595, 606.)

Plaintiff concedes that an ALJ need not discuss every piece of evidence but contends that the evidence upon which the ALJ relied "actually demonstrates consistency rather than inconsistency with Dr. Kumar's opinion." (Doc. 24 at 7). The Court, however, is satisfied that the evidence upon which the ALJ relied bolsters her finding that the "level and frequency of treatment and objective findings in Dr. Kumar's treatment record do not support days off work in her residual functional capacity." (*See* AR 23.) To summarize, the record confirms that Dr. Kumar saw Plaintiff only every two to three months, that she treated Plaintiff with prescription medication, which, by February 2020, provided "considerable improvement," and that she otherwise recommended conservative, non-invasive treatment, primarily through movement and exercise. (AR 20-21.) Perhaps most importantly, Dr. Kumar's physical examination findings, in terms of edema, synovitis, and range of motion, were largely normal. (*See* AR 21-22.) Even considering the notations Plaintiff highlights from Dr. Kumar's records, the Court cannot say that the ALJ's

finding as to supportability is "overwhelmed by other evidence in the record." *See Langley*, 373 F.3d at 1118 (quotation omitted). Nor was it merely conclusory.

Ultimately, the Court finds that the ALJ's discussion of the supportability factor met the articulation standard under 20 C.F.R. § 404.1520c(b) and that her supportability analysis is supported by substantial evidence.

### 2. *Consistency Factor*

The consistency factor calls for a comparison between the subject medical opinion and "evidence from other medical sources and nonmedical sources" in the record. 20 C.F.R. § 404.1520c(c)(2). "The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." *Id*. In terms of consistency, the ALJ explained that Dr. Kumar's opinion (i.e., that Plaintiff could experience "painful flare ups that can last [a] few days" and require "rest") was "not consistent with other medical records showing negative workups and limited follow-up with any specialist care." (AR 23 (citing AR 379-493, 516-613).)

Plaintiff argues that "[m]issing from the ALJ's analysis is a review of the specific evidence that contradicts Dr. Kumar's opinion." (Doc. 24 at 7). She submits that the ALJ's citation to "202 pages of medical evidence" is not sufficiently specific to satisfy 20 C.F.R. § 404.1520c(c)(2) and, again, maintains that the medical evidence, "when reviewed in its entirety[,] actually demonstrates *consistency* rather than *inconsistency* with Dr. Kumar's opinion." (Doc. 24 at 7 (emphasis added).) The Commissioner counters, arguing that Plaintiff's position overlooks the ALJ's "extensive discussion of [the referenced] medical evidence . . . ." (Doc. 25 at 9 (citing AR 18-22).) When considered together with the ALJ's explicit persuasiveness assessment of Dr. Kumar's opinion, the Commissioner insists that the ALJ's discussion of the medical evidence is sufficiently specific

and supported by substantial evidence. (*Id.* (citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Cox v. Saul*, No. 19-1117 KBM, 2020 WL 6701426, at *6-7 (D.N.M. Sept. 9, 2020); *Vigil v. Berryhill*, No. 18-691-KBM, 2019 WL 2524765, at *9 (D.N.M. June 19, 2019)).) The Court agrees with the Commissioner. Having considered the ALJ's thorough discussion of the medical evidence, the Court is satisfied that she adequately outlined both "the records showing negative workups" and the "limited follow-up with any specialist care" that she described in her persuasiveness assessment.

First, the ALJ concluded that Plaintiff's "clinical exams of record" were "not strongly adverse." (AR 21.) She noted the absence of fibromyalgia tender point exams in the record. (AR 21.) Consistent with Dr. Kumar's findings of no extremity edema, joint synovitis, reduced range of motion, or abnormal gait, the ALJ highlighted Plaintiff's primary care provider's similarly-positive examination findings of "normal gait, rise, balance, sensation, deep tendon reflexes, . . . joint palpation, range of motion, stability and strength." (AR 22 (citing AR 450-52, 520-21).) Likewise, she explained that Plaintiff's oncologist observed normal gait and "normal range of motion, strength, and tone with no focal neurologic findings." (AR 22 (citing AR 529).) In terms of mental health, the ALJ emphasized that Plaintiff's primary care provider found "normal judgment/insight, orientation, and mood/affect." (AR 22 (citing AR 450-52, 520-21).)

Second, the ALJ discussed other negative workups, including a "negative" sleep apnea study in March 2019 (AR 21 (citing AR 459)), a "negative" esophagogastroduodenoscopy in April 2018 (AR 21 (citing AR 480)), a "reassuring" abdominal ultrasound in April 2018 (AR 21 (AR 478, 569), and an "essentially unrevealing" esophagogastroduodenoscopy with biopsies in February 2020. (AR 21 (citing AR 570-74, 595)).

Third, the ALJ concluded that "[t]he diagnostic imaging of the spine [was] not strongly adverse." (AR 21.) Acknowledging that a December 2019 MRI "revealed facet arthropathy and a small disc osteophyte complex," the ALJ highlighted various positive findings, including "only mild convex lumbar curvature with apex at L4-5," a normal signal of the cervical spinal cord with no spinal stenosis, well-preserved disc space heights, a negative cervical spine x-ray, and a patent neural foramen. (AR 21 (citing AR 481-82, 506).) Finally, the ALJ noted that Plaintiff's chiropractor found "intact motor and sensation of the upper and lower extremities," though he also acknowledged partially limited range of back and neck motion. (AR 22 (citing AR 486-87).)

Throughout her discussion of the medical evidence, the ALJ also made specific observations as to Plaintiff's lack of follow-up care with specialists. She noted, for example, that although Plaintiff reported feeling 70% improved with once-per-week chiropractic treatments, she did not appear to have sought follow-up chiropractic treatment after May 2019, save one visit with a different chiropractor in November 2019. (AR 19 (citing AR 306-78, 455, 483-93).) Next, the ALJ observed that there was no neurological evaluation in the record. (AR 20 (citing AR 394-97, 408-10, 426, 450).) Similarly, despite recommendations from Plaintiff's rheumatologist that she attend mental health therapy and counseling on a regular basis (AR 541-43), the ALJ found "no indication of any individual therapy or counseling or other specialist treatment, such as with a psychiatrist" (AR 20). According to the ALJ, it was also "notable" that Plaintiff was not evaluated by an orthopedist, surgeon, or other specialist for her back and neck issues and that she was not treated with physical or aquatic therapy, a TENS unit, or injections. (AR 20.) Noting a January 2020 evaluation by a gastroenterologist for dyspepsia and nausea, the ALJ emphasized that there was no indication that Plaintiff followed up with a gastroenterologist, though she continued to take medication for her gastrointestinal issues. (AR 21 (citing AR 567-69).) Relatedly, the ALJ

concluded that Plaintiff's treatment for her "functionally limiting symptoms" was "fairly conservative" and "partially effective." (AR 19.)

When considered together with the ALJ's thorough summary of the medical record, including her discussions of various negative workups and the absence of follow-up care with different types of specialists, the Court finds that the ALJ's consistency analysis meets the articulation standard under 20 C.F.R. § 404.1520c(b). In short, the ALJ's reasoning is supported by substantial evidence and capable of meaningful review.

### iii. Other Factors

The ALJ may, but is generally not required to, discuss other considerations that bear upon the persuasiveness of a medical opinion.[3] She may, for instance, discuss the relationship between the medical source and the claimant, the medical source's specialization, and/or the source's familiarity with the SSA's policies and evidentiary requirements. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 404.1520c(c)(3)-(5); *Zhu*, 2021 WL 2794533, at *6 n.9. Here, Plaintiff contends that the ALJ failed to properly account for Dr. Kumar's treatment relationship and her medical specialization. (Doc. 24 at 8). To the contrary, though, the ALJ explicitly discussed both. She acknowledged Dr. Kumar's status as Plaintiff's "treating rheumatologist." (AR 23). Moreover, earlier in her decision, she discussed the frequency of Plaintiff's visits with Dr. Kumar and detailed Dr. Kumar's treatment methods and examination findings. (*See* AR 19-22). The Court finds no error with respect to the ALJ's consideration of Dr. Kumar's treatment relationship or her specialization.

---

[3] The revised regulation provides that if differing medical opinions are equally well-supported and consistent with the record, the ALJ must articulate how she considered other § 404.1520c factors beyond supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(3); 404.1520c(c)(3)-(5). Here, Plaintiff does not point to differing medical opinions that are "equally well-supported and consistent with the record." (*See* Doc. 24 at 9.)

Plaintiff makes a related argument that the "ALJ improperly disregarded the opinion of Dr. Kumar based upon the lack of specific functional limitations of how long or frequent [she] would need to rest." (Doc. 24 at 9.) Plaintiff concedes that Dr. Kumar did not specify how long or how frequently Plaintiff would need to rest but nevertheless maintains that it was improper for the ALJ to "summarily disregard" Dr. Kumar's opinion on these bases. (*Id.*) Plaintiff suggests, almost in passing, that the ALJ should have ordered a consultative examination if she "felt the need for specific RFC findings." (*Id.*)

The Court rejects Plaintiff's undeveloped argument concerning a consultative examination. The ALJ had "broad latitude" in determining whether to order such an examination. *See Jazvin v. Colvin*, 659 F. App'x 487, 489 (10th Cir. 2016). Plaintiff was represented by counsel, who gave no indication at the administrative hearing that the record was insufficient or that a consultative examination was necessary. (See AR 33-36, 54-57.) Notably, the Tenth Circuit has held that an ALJ should "ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored, and the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) (quotation marks and quotation omitted). Because the need for a consultative examination was not clearly established by the record here, the ALJ was under no duty to procure one. *See Jazvin*, 659 F. App'x at 489.

Moreover, the ALJ did *not*, as Plaintiff suggests, disregard Dr. Kumar's opinion merely because she failed to offer specific functional limitations. Rather, the ALJ found Dr. Kumar's opinion "not entirely persuasive" for four independent reasons:  (1) because Dr. Kumar offered only "limited explanation in [her] letter"; (2) because Dr. Kumar failed to specify in her opinion how long or how frequently Plaintiff would need to rest; (3) because Dr. Kumar's treatment and

objective findings failed to support her own opinion; and (4) because Dr. Kumar's opinion was not consistent with other medical records, which revealed "negative workups" and "limited follow-up with any specialist care." (AR 23.) The Court finds these reasons sound and adequate to meet the ALJ's obligations under 20 C.F.R. § 404.1520c. The Court will not reverse on this ground.

### B. The ALJ properly considered Plaintiff's fibromyalgia impairment and adequately accounted for fibromyalgia-related limitations in her RFC.

Next, Plaintiff argues that the ALJ failed to properly account for pain and symptoms caused by her fibromyalgia. (Doc. 24 at 10.) She attributes this error to the ALJ's purportedly "contradictory" findings at step two: that her fibromyalgia was a "severe impairment" but that her fibromyalgia diagnosis was "vague." (*Id*.) The Commissioner, in contrast, contends that the ALJ properly considered Plaintiff's fibromyalgia symptoms and their effect on her RFC. (Doc. 25 at 12-16.)

Fibromyalgia is a chronic rheumatic condition that in some claimants causes "long-term but variable levels of muscle and joint pain, stiffness and fatigue." *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003). A claimant can demonstrate that she has a medically determinable impairment of fibromyalgia by providing evidence from an acceptable medical source[4] of a diagnosis of fibromyalgia. SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). But a physician's diagnosis is not enough. *See id*. To qualify as a medically determinable impairment, a physician must diagnose fibromyalgia using one of two listed sets of criteria: the 1990 ACR Criteria for the Classification of Fibromyalgia (the 1990 ACR Criteria) or the 2010 ACR Preliminary Diagnostic Criteria (the 2010 ACR Criteria). *Id*. at *2-3. Further, the medical evidence must establish that the claimant meets the criteria. *Id*.

---

[4] Only a licensed physician (a medical or osteopathic doctor) may provide evidence of a medically determinable impairment of fibromyalgia. SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012).

The ALJ recognized that Social Security Ruling ("SSR") 12-2p describes the evidence required to establish a medically determinable impairment of fibromyalgia, and she listed fibromyalgia among Plaintiff's severe medically determinable impairments at step two of her sequential evaluation process. (AR 16.) In evaluating Plaintiff's fibromyalgia at step three, though, the ALJ found that there was "no evidence that fibromyalgia medically equals a listing, either individually or in combination with another impairment." (AR 15-16.) In support, she acknowledged that Plaintiff's rheumatology records reference fibromyalgia; yet, she found the record "somewhat vague as to diagnoses with evidence that fibromyalgia is a medically determinable impairment under SSR 12-2p." (AR 16.) The ALJ observed that there was neither a fibromyalgia positive tender point examination in the record nor a diagnosed arthritic condition, despite a positive ANA finding. (AR 16.) Despite some ambiguity as to a fibromyalgia diagnosis,[5] the ALJ explained that she gave Plaintiff "the benefit of the doubt" in finding that her fibromyalgia was a severe medically determinable impairment. (AR 15-16.) Having done so, she went on to consider whether Plaintiff's fibromyalgia medically equaled a listing, and, critically, she considered fibromyalgia-related symptoms, such as arthralgias, myalgias, and fatigue, in determining her RFC. (AR 19-23.)

Nevertheless, Plaintiff argues that the ALJ's second-guessing of her fibromyalgia diagnosis constitutes an attempt to "play doctor" and to substitute her own lay opinion for that of Dr. Kumar. (Doc. 24 at 12.) She emphasizes that Dr. Kumar diagnosed "myofascial pain syndrome." (*Id*. (citing AR 394-407).) Because "[m]yofascial pain syndrome is thought to develop

---

[5] The issue of Plaintiff's fibromyalgia diagnosis came up at the administrative hearing. There, the ALJ indicated that it did not appear from the record that Dr. Kumar had "actually diagnosed" Plaintiff with fibromyalgia. (AR 40.) Plaintiff responded, explaining that Dr. Kumar "thinks that it's fibromyalgia . . . [s]o she is treating me for fibromyalgia." (AR 40.) Later on, Plaintiff testified that Dr. Kumar had diagnosed her with fibromyalgia, but they were "still trying to figure out where the issue is coming from." (AR 46.)

into fibromyalgia" and because "[n]ewer guidelines from the American College of Rheumatology don't require a tender point exam," it follows, she suggests, that the ALJ should not have questioned her diagnosis. (*Id*. (citations omitted).)

Under the 1990 ACR Criteria, the SSA may find a medically determinable impairment of fibromyalgia only if the claimant has:  (1) "[a] history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) – that has persisted (or that persisted) for at least 3 months"; (2) "[a]t least 11 positive tender points on physical examination"; and (3) "[e]vidence that other disorders that could cause the symptoms or signs were excluded." SSR 12-2p, 2012 WL 3104869, at *2-3. Under the 2010 ACR Criteria, instead of relying on tender points to demonstrate the second requirement, a claimant may show that she has "[r]epeated manifestations of six or more [fibromyalgia] symptoms . . . , especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." *Id*. (footnotes omitted). Under either set of criteria, a claimant must show the exclusion of other disorders that could cause the symptoms or signs of fibromyalgia. *Id*. The 2010 ACR Criteria do not supersede the 1990 ACR Criteria. *See id*. Instead, either avenue is available to establish a medically determinable impairment of fibromyalgia. *Id*. at *2 (noting the ruling "provide[s] two sets of criteria for diagnosing [fibromyalgia]," either of which is sufficient to establish the impairment).

The ALJ's analysis here suggests that she considered both sets of criteria used to establish fibromyalgia as a medically determinable impairment, as outlined in SSR 12-2p. (*See* AR 16.) As to the 1990 ACR Criteria, the ALJ noted no positive tender points examinations in all four quadrants, though she acknowledged that Plaintiff complained of pain "in all extremities." (AR

16.) Critically, though, she referenced lingering questions as to the possibility of an arthritic condition, given the positive ANA findings in Plaintiff's medical records. Technically, an inflammatory arthritic condition would need to be excluded under both sets of criteria to establish fibromyalgia as a medically determinable impairment. *See* SSR 12-2p, 2012 WL 3104869, at *2-3. By highlighting the still-undiagnosed arthritic condition, the ALJ was showing that Plaintiff's fibromyalgia did not precisely meet *either* set of criteria. The Court can follow the ALJ's reasoning and finds substantial evidence to support her conclusion that the record was "somewhat vague" as to whether Plaintiff's fibromyalgia is a medically determinable impairment under SSR 12-2p. The ALJ's treatment of Plaintiff's fibromyalgia as a severe medically determinable impairment for purposes of proceeding to subsequent steps of the sequential evaluation process was a benefit to Plaintiff, not a detriment. Even so, the Court's inquiry continues.

Plaintiff next submits that the ALJ's approach – finding her fibromyalgia diagnosis "vague" but treating her fibromyalgia as a medically determinable impairment – infected her RFC analysis and caused her to inadequately account for Plaintiff's fibromyalgia-related symptoms. (Doc. 24 at 10.) Specifically, she argues that the ALJ's RFC failed to account for her limitations in lifting, squatting, bending, sitting, walking, and maintaining persistence and pace. (*Id*. at 13.)

The Court is unconvinced. The ALJ thoroughly articulated her RFC assessment, and the Court sees no indication that giving Plaintiff the "benefit of the doubt" as to whether her fibromyalgia was a medically determinable impairment somehow resulted in an RFC that was unsupported by substantial evidence. The ALJ specifically discussed Plaintiff's complaints, among others, that she had "difficulty lifting, squatting, bending, sitting . . . remembering, completing tasks, [and] concentrating." (AR 18.) As discussed more fully below, she found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [those] symptoms [were]

not entirely consistent with the medical evidence and other evidence in the record." (AR 19.) With respect to lifting, the ALJ referenced Plaintiff's testimony that her back pain limited her to lifting ten pounds, but her Function Report indicated that she could lift up to 25 pounds. (AR 18; *compare* AR 40, *with* AR 224.) The ALJ explained that a limitation to light work was consistent with Plaintiff's "fairly conservative" treatment for degenerative disc disease and fibromyalgia, but she went on to account for Plaintiff's hand and wrist swelling and reduced range of motion in her spine by assessing *further* postural and manipulative restrictions. (*See* AR 23.)

As to Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ determined at step three that Plaintiff had only a mild limitation in this area of functioning. (AR 17.) In support, she explained that a "second Function Report did not allege[] difficulty concentrating and stated [Plaintiff] could pay attention for as long as needed." (AR 17; *see also* AR 261, 490.) Although Plaintiff reported some difficulty completing tasks, the ALJ noted that she engaged in activities that "require some significant concentration[,]" including "reading, watching television, puzzles, board games, driving, and handling finances." (AR 17.) The ALJ also observed that Plaintiff's treating providers had not mentioned "specific cognitive deficits." (AR 17.) At the same time, though, the ALJ acknowledged that Plaintiff's fibromyalgia "may be associated with her mental impairments," noting that Plaintiff had expressed "symptoms such as fatigue and difficulty sleeping in the setting of fibromyalgia." (AR 22.) Accordingly, the ALJ concluded that Plaintiff "would do better with a stable work environment" and "a limitation on interaction with the general public." (AR 22.)

Plaintiff fails to demonstrate that the ALJ's discussion of her fibromyalgia was legally flawed or that the ALJ inadequately considered the limiting effects of her fibromyalgia in assessing her RFC. Rather, the ALJ's analysis reveals thorough consideration of Plaintiff's fibromyalgia-

related symptoms despite her misgivings about whether the criteria for establishing a medically determinable impairment were technically satisfied. The Court will not reverse on this ground.

### C. The ALJ properly considered Plaintiff's migraines and adequately accounted for migraine-related limitations in her RFC.

Plaintiff next contends that the ALJ "ignored the longitudinal and consistent evidence of [her] migraines and failed to include resulting limitations on her ability to function." (Doc. 24 at 14.) Plaintiff submits that the severity of her migraines supported additional limitations in terms of work absences and concentrating, persisting, and maintaining pace. (*Id.* at 14-15.) The Commissioner, on the other hand, maintains that the ALJ thoroughly discussed her migraines and appropriately limited her to light work with specific environmental and noise limitations to account for her migraines. (Doc. 25 at 15 (citing AR 17, 23).) The Commissioner's position is the more persuasive one.

The ALJ explicitly discussed Plaintiff's hearing testimony and other reports related to her migraines, which the ALJ summarized as follows:

> She reported migraines at least twice a week last[ing] for a few hours up to [three] days. During a migraine, she allegedly has to lie down in a dark room all day. She does not do anything on days she has migraines. She feels week, dizzy, nauseas [sic], and like she is going to pass out. She has light sensitivity with bright lights[,] and they are worse with loud noise.

(AR 18.) With respect to treatment, the ALJ observed that Plaintiff alternated between two migraine medications, topiramate and rizatriptan, as needed, but did not use a daily migraine preventative medication. (AR 21 (citing AR 33-57, 293, 603-06).) The ALJ also highlighted Dr. Kumar's remarks in June 2019 that "[i]t is possible that [Plaintiff's] migraines are somewhat better and she does not have to take triptans on a regular basis." (AR 20; *see also* AR 428.)

In the ALJ's assessment, the record was not "entirely consistent with the alleged severity and frequency of [Plaintiff's migraine] symptoms," especially given that Plaintiff did not use a

regular preventative migraine medication and had not been evaluated by a neurologist. (AR 20 (citing AR 394-97, 408-10, 426, 450).) As with her treatment for other conditions, the ALJ described Plaintiff's migraine treatment as "fairly conservative." (AR 23.) Still, the ALJ found Plaintiff's migraines to be a severe medically determinable impairment for which she assessed limitations in the RFC. (*See* AR 15, 23.) Explaining that "noise and environmental limitations [were] supported due to [Plaintiff's] migraines," the ALJ limited Plaintiff to light work with no "concentrated exposure to environmental irritants" and to a noise level of "moderate or less," but she declined to impose additional functional limitations on account of Plaintiff's migraines. (AR 17-23.)

While Plaintiff contends that her migraines supported additional work absences and limitations in concentrating, persisting, and maintaining pace, she references only her hearing testimony in support of that contention. (Doc. 24 at 14-15.) As explained above, the ALJ determined that Plaintiff's reports of difficulty concentrating were undermined by her contradictory report that she could pay attention for as long as needed and by hobbies that required significant concentration. (*See* AR 17.) The ALJ explicitly acknowledged Plaintiff's reports that she was virtually incapacitated by migraines twice a week, but for the reasons discussed above, she did not find those reports fully supported when weighed against the record. (*See* AR 20). Thus, the ALJ had no obligation of wholesale acceptance as to those complaints.

Without reweighing the evidence, the Court finds no indication that the ALJ ignored limitations caused by Plaintiff's migraines and finds, instead, that the ALJ's findings related to Plaintiff's migraines and her RFC assessment are supported by substantial evidence. The Court denies Plaintiff's motion as to this ground.

**D.  The ALJ properly considered Plaintiff's anxiety and depression and adequately accounted for Plaintiff's mental limitations in her RFC.**

Plaintiff contends that the ALJ failed to account for limitations stemming from her anxiety and depression despite characterizing these impairments as severe. (Doc. 24 at 15.) The Commissioner counters, maintaining that the ALJ's RFC assessment *did* account for the limitations produced by Plaintiff's anxiety and depression and is supported by substantial evidence. (Doc. 25 at 16-17.)

In assessing Plaintiff's mental impairments under the "paragraph B" criteria, the ALJ determined that Plaintiff had a "moderate limitation" in "adapting or managing oneself." (AR 17.) She observed that Plaintiff has "some anxiety and depression in the setting of fatigue and difficulty sleeping." (AR 17.) She also noted Plaintiff's reports of difficulty with handling stress and changes in routine. (AR 17.) On the other hand, the ALJ found that Plaintiff "generally had normal mood and affect in no acute distress" and was "generally capable of independent mental activities of daily living within physical tolerances such as personal care, simple meal preparation, light chores such as laundry, shopping, driving, handling money, engaging in hobbies, and assisting with childcare." (AR 17 (citing AR 33-57, 219-26, 256-63, 379-445, 446-82, 490, 516-35, 536-60).)

In her RFC assessment, the ALJ described Plaintiff's mental health treatment as "very routine and conservative." (AR 22.) She noted, for instance, that Plaintiff's rheumatologist prescribed duloxetine and recommended therapy; however, she found no indication that Plaintiff attended individual therapy or received specialist treatment with a psychiatrist.[6] (AR 20.) Moreover, the ALJ found that by February 2020, Plaintiff noticed "considerable improvement" on her medication regimen of mirtazapine and duloxetine. (AR 20.) Similarly, she mentioned Plaintiff's testimony that her anxiety medication, which she takes every four to six hours, helps

---

[6] The ALJ acknowledged that Plaintiff reported attending couples counseling with her husband, as they were "headed for divorce." (AR 20.)

with her anxiety. (AR 19; *see also* AR 42.) The ALJ reiterated that Plaintiff's medical providers typically found her to have normal mood and affect. (AR 22.) With the exception of one visit during which Plaintiff was tearful, her rheumatologist generally found her to be "pleasant, oriented, in no acute distress, and with normal mood and affect." (AR 22 (citing AR 397, 411, 420, 429, 544, 551, 595, 606).) Plaintiff's primary care provider, in turn, "observed normal judgment/insight, orientation, and mood/affect. (AR 22 (citing AR 450-52, 520-21).)

Nevertheless, because there was evidence in the record that Plaintiff experienced "mood swings," the ALJ determined that she would "do better with a stable work environment." (AR 22.) She therefore limited Plaintiff to work "performed in the same location every day." (AR 18.) In addition, the ALJ found that "a limitation on interaction with the general public [was] appropriate" to account for Plaintiff's "anxiety with going out." (AR 22.) She limited Plaintiff to work requiring her to only "occasionally interact with the general public." (AR 18.)

The Commissioner insists that the limitations discussed by the ALJ adequately account for Plaintiff's adaptive limitations. (Doc. 25 at 16.) Plaintiff, for her part, contends that the "ALJ failed to include any adaptation limitation in the RFC." (Doc. 24 at 16 (citing AR 17).) Plaintiff does not, however, cite to any on-point authority to support the notion that a limitation to work performed in the same location every day does not address adaption limitations. She merely refers to the Program Operations Manual System ("POMS"), which explain that adaptive functions "pertain to the individual's ability to: plan, respond to changes, deal appropriately with mental demands (stress), avoid hazards and maintain safe behavior, follow rules, adhere to schedules and to time constraints, and travel." (Doc. 24 at 16 (citing POMS DI 24510.061(B)(4)(A)).) The POMS enumerate different areas of functioning that may be affected by an individual's adaptation limitations; they do not specify the functional limitations to be incorporated into an RFC. *See*

POMS DI 24510.061. Moreover, as the Commissioner points out, Plaintiff herself "does not specify what functional limitation the ALJ should have adopted . . . , nor how that limitation would have changed the outcome of this case." (Doc. 25 at 16 (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Parrish v. Berryhill*, No. 16-cv-0453-LAM, 2017 WL 2491526, at *6 (D.N.M. Apr. 12, 2017)).)

The Court finds that the ALJ discussed the medical evidence and Plaintiff's subjective complaints related to her mental impairments, and she articulated specific RFC limitations to account for those impairments. While Plaintiff might have weighed the evidence differently, the Court finds that the ALJ adequately explained how she accounted for Plaintiff's mental limitations and that substantial record evidence supports her RFC finding.

### E.    The ALJ properly considered Plaintiff's gastrointestinal symptoms.

Plaintiff accuses the ALJ of "neglect[ing] to analyze" and "fail[ing] to reference" her gastrointestinal ("GI") symptoms and of not adequately accounting for the effects of those symptoms in her RFC. (Doc. 24 at 17.) The Commissioner concedes that the ALJ did not adopt any specific limitations related to Plaintiff's GI issues in her RFC but maintains that she thoroughly discussed Plaintiff's GI symptoms and reasonably determined that the record did not support greater functional limitations than those assessed in the RFC. (Doc. 25 at 17-18.)

To begin, the Court observes that the ALJ did not characterize Plaintiff's GI-related issues as a medically determinable impairment, severe or non-severe, at step two. (AR 15-16.) Indeed, she did not provide any discussion of Plaintiff's GI symptoms at that stage of her analysis. (AR 15-16.) Nevertheless, any error in failing to consider Plaintiff's GI symptoms at step two was harmless, so long as the the ALJ proceeded through the sequential evaluation process and

considered Plaintiff's GI symptoms in conjunction with her RFC assessment. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008).

Plaintiff's contention that the ALJ failed to discuss or reference her GI symptoms is demonstrably false. The ALJ specifically mentioned Plaintiff's reports of daily irritable bowel syndrome symptoms, nausea, and stomachaches. (AR 18.) As with her treatment of other symptoms and impairments, the ALJ characterized Plaintiff's treatment for GI-related symptoms as "fairly conservative" and "partially effective." (AR 19.) She observed that Plaintiff used anti-nausea medications, Tums, and hot tea and that medical providers prescribed lifestyle and dietary measures. (AR 18, 21 (citing AR 567-69).) In terms of medications, the ALJ noted prescriptions for Omeprazole and Compazine and highlighted Plaintiff's testimony that Compazine "helps."[7] (AR 19-20.) The ALJ noted the absence of "follow-up visits with the gastroenterologist[,] . . . though [Plaintiff] did continue on medication." (AR 21 (citing AR 478, 480).) Perhaps most critically, the ALJ discussed a gastroenterologist's January 2020 evaluation of Plaintiff for dyspepsia and nausea during which Plaintiff reported "loose stools, once per day." (AR 21.) In the ALJ's assessment, this record did not support a "frequency of restroom visits that would require additional work breaks in her residual functional capacity." (AR 21.)

It is this last finding to which Plaintiff primarily objects. She argues that her need to be near a restroom after eating "would undoubtedly affect [her] ability to maintain pace at work and would affect her time off task and amount of breaks she was given." (Doc. 24 at 17.) In support,

---

[7] Initially, Plaintiff testified that she took Compazine daily for anxiety and nausea, and "[i]t helps *with the anxiety*." (AR 43 (emphasis added).) However, when the ALJ asked how often she "experienced irritable bowel," she explained that it was "every day" but that her daily medication, presumably Compazine, "help[s]" with gastrointestinal upset. (AR 49.) Plaintiff also testified that Ondansetron was "pretty strong" and made her "fall asleep," such that she typically used Compazine instead for nausea. (*See* AR 43.)

she refers to her own testimony that she requires the restroom, sometimes more than once, beginning 30 minutes after eating. (Doc. 26 at 7 (citing AR 49).) She also cites a 2019 treatment record from her primary care provider, which documents her reports of alternating diarrhea and constipation. (*Id*. (citing AR 520).) Yet, the Court is satisfied that the ALJ took account of Plaintiff's GI symptoms, including her need to use the restroom after eating, but simply determined that her symptoms were not severe enough to necessitate additional work breaks or other limitations in her RFC. The Court declines Plaintiff's implicit invitation to reweigh the evidence concerning her GI symptoms. Substantial evidence supports the ALJ's finding, and the Court finds no legal error in her consideration of Plaintiff's GI symptoms. The Court denies Plaintiff's motion as to this ground.

### F. The ALJ properly considered the Third-Party Function Report submitted by Plaintiff's father.

Plaintiff contends that the ALJ "committed an error of law by failing to consider" her father's Third-Party Function Report. (Doc. 24 at 18-19.) To the contrary, the ALJ specifically referenced and discussed portions of the report provided by Daniel Garcia, Plaintiff's father. (*See* AR 19.) Moreover, the parties agree that under the applicable regulations, the ALJ was not required to articulate her consideration of nonmedical sources, such as those from Plaintiff's family members. (*See* Docs. 24 at 18; 25 at 19-20; *see also* 20 C.F.R. § 404.1520c(d) ("We are not required to articulate how we considered evidence from nonmedical sources.").) Even so, Plaintiff insists that Mr. Garcia "provides valuable evidence regarding her activities of daily living and disease progression" and that proper consideration of his statements "would have led to a more restrictive RFC." (Doc. 24 at 19.) The Court is not convinced.

The ALJ summarized Mr. Garcia's function report, noting Mr. Garcia's impressions that Plaintiff had severe headaches that required naps, sometimes experienced nervous breakdowns,

could not lift a two-year old without severe pain, and could only do one chore per day without becoming exhausted. (AR 19 (citing AR 228-35).) The ALJ acknowledged Mr. Garcia's report that on days when Plaintiff did not have a migraine, she could make meals and go for a walk around the block. (AR 19 (citing AR 228-35).)

When considered together with the ALJ's findings concerning Plaintiff's allegedly disabling impairments, it is clear that the ALJ implicitly rejected Mr. Garcia's statements as to Plaintiff's functioning. She rejected, for instance, the suggestion of disabling migraines, emphasizing that Plaintiff did not use a regular preventative migraine medication, had not been evaluated by a neurologist, and underwent conservative but effective treatment for her migraines. (AR 20-23.) Although she found some mental-impairment-related limitations warranted, she rejected more restrictive limitations, describing Plaintiff's mental health treatment as "very routine," "conservative," and somewhat effective. (AR 19, 20, 22.) In so finding, she highlighted Plaintiff's lack of individual therapy and her generally normal mood and affect upon examination by health care providers. (*See* AR 22.) As to Plaintiff's lifting capacity, the ALJ highlighted conflicting reports by Plaintiff regarding the maximum weight she could lift, and she concluded that a limitation to light work was consistent with Plaintiff's "fairly conservative" treatment for degenerative disc disease and fibromyalgia. (AR 18, 23.) In short, the ALJ considered Mr. Garcia's statements in his function report and implicitly rejected those statements to the extent that they were inconsistent with the RFC she assessed. The Court finds no legal error in the ALJ's consideration of Mr. Garcia's function report.

**G. The ALJ reasonably found Plaintiff's statements concerning her symptoms of pain and fatigue were not entirely consistent with the medical evidence and other evidence of record.**

Plaintiff contends that the ALJ erred in assessing her subjective symptoms of pain. (Doc. 24 at 19.) Indeed, she suggests that the ALJ's "regurgitation of the medical records" contradicts the ALJ's assertion that Plaintiff's statements concerning intensity, persistence, and the limiting effects of her symptoms were not entirely consistent with the medical evidence. *Id*. Plaintiff further insists that the record is "replete with her reports of pain, depression and anxiety, along with prescription trials and medical refills." *Id*. at 21.

SSR 16-3p defines the two-step process an ALJ must use when evaluating a claimant's symptoms. *See* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). At the first step, the ALJ "consider[s] whether there is an underlying medically determinable physical or mental impairment[] that could reasonably be expected to produce [the] individual's symptoms such as pain." *Id*. at *3. At the second step, after the ALJ has found such an impairment, the ALJ "evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the] individual's ability to perform work-related activities . . . ." *Id*. The ALJ considers the record evidence, the claimant's statements, the medical and non-medical source statements, and a non-exhaustive list of factors provided in 20 C.F.R. § 404.1529(c)(3), which include:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7-8.

Here, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (AR 19). In so finding, Plaintiff insists that the ALJ failed to sufficiently consider the SSR 16-3p factors with respect to her subjective complaints of pain and fatigue. (Doc. 24 at 19-21.)

Relevant to SSR 16-3p, the ALJ explicitly discussed:

***Daily activities:*** The ALJ indicated that Plaintiff cares for her three young children with the help of her parents. (AR 22.) The ALJ also observed that "in spite of her impairments, [Plaintiff] has reported engaging in . . . personal care, simple meal preparation, light chores such as laundry, [and] shopping in stores . . . ." (AR 22.) She also listed various other activities in which Plaintiff reported engaging, including reading, watching television, doing puzzles and board games, driving, and handling finances. (AR 17 (citing AR 219-26, 256-63, 379-445, 446-82, 490, 516-35, 536-60).) The ALJ acknowledged Plaintiff's reports that a lack of motivation and energy impacts her ability to maintain her hygiene and engage in self-care. (AR 19.)

***The location, duration, frequency, and intensity of pain or other symptoms and factors that precipitate and aggravate those symptoms:*** The ALJ reviewed Plaintiff's complaints of pain and fatigue, noting fibromyalgia "flareups" in the morning and evening. (AR 18.) She mentioned Plaintiff's reports of pain in her arms and legs when she is active or when she holds an item for a long period. (AR 18.) Likewise, she discussed Plaintiff's complaints of lower back pain upon lifting more than ten pounds. (AR 18). The ALJ acknowledged Plaintiff's complaints that she felt "fatigue[d] as though she had a stomach virus daily." (AR 18.)

***Type, dosage, effectiveness, and side effects of any medication:*** According to the ALJ, Plaintiff's medication regimen for pain relief included prescriptions for mirtazapine,

hydrochlorothiazide, and hydroxychloroquine. (AR 20.) In terms of side effects, the ALJ noted weight gain and upset stomach. (AR 19, 21.) According to the ALJ, Plaintiff "averred that medication is minimal help for pain and flares" (AR 19), but that "ibuprofen and heat and cool packs help." (AR 20 (citing AR 520-21).)

*Treatment other than medication:* In addition to Plaintiff's use of heat and cool packs, the ALJ mentioned Plaintiff's use of Icy Hot and her six months of chiropractic sessions that led to 70% improvement. (AR 19.) The ALJ referenced recommendations from Plaintiff's rheumatologist that she engage in "physical activity, aerobic exercise, Tai Chi, yoga, Pilates, etc. for myofascial pain." (AR 20.) She also outlined treatment modalities that had *not* been prescribed, including "physical or aquatic therapy, use of TENS unit, [and] injections." (AR 20.) The ALJ repeatedly described the treatment for Plaintiff's impairments and pain as "conservative." (*See* AR 19-20, 22-23.)

Although Plaintiff cannot dispute that the ALJ discussed the factors above, she nevertheless takes issue with the ALJ's characterization of the evidence pertaining to these factors. Clearly, Plaintiff would have weighed the medical evidence differently. To the extent Plaintiff asks the Court to reweigh the record evidence, the Court must again decline. Taken as a whole, the ALJ's decision provides reasons, supported by substantial evidence, for not fully accepting Plaintiff's reported symptoms. Relatedly, the ALJ reasonably found that Plaintiff's activities of daily living suggest that she was less limited than alleged. The Court is satisfied that the ALJ adequately explained her findings pursuant to SSR 16-3p, and Plaintiff has not identified any meritorious reason for remand related to the ALJ's consideration of her subjective complaints. The Court will not remand on this ground.

### H.  The ALJ did not error in eliciting vocational testimony, and substantial evidence supports the ALJ's findings at step five.

Plaintiff's final few arguments relate to errors purportedly made in the context of vocational testimony and the ALJ's reliance on that testimony at steps four and five of the sequential evaluation process. (*See* Doc. 24 at 21-26.) At the administrative hearing, the ALJ sought vocational testimony that would help inform whether Plaintiff could perform her past relevant work or other work available in the economy, given her RFC. With that aim, the ALJ posed a hypothetical question to the VE – basically, whether a hypothetical person with an RFC that mirrored Plaintiff's RFC could perform Plaintiff's past relevant work. (*See* AR 52-53.) In response, the VE testified that such an individual ***could*** perform Plaintiff's past relevant work as an order clerk. (AR 38-39, 52-53.) Alternatively, the VE testified that the hypothetical individual with Plaintiff's RFC would also be capable of performing other jobs existing in significant numbers in the national economy. (AR 53.) Plaintiff now alleges various errors by the ALJ in questions she presented to the VE at the administrative hearing, in her past-relevant-work determination at step four, and in her step-five analysis. (*See* Doc. 24 at 21-26.)

Plaintiff's first two arguments require little analysis. First, Plaintiff contends that the hypothetical question posed by the ALJ to the VE did not contain all warranted functional limitations. (Doc. 24 at 22-23.) In essence, she simply rehashes her previous arguments that the ALJ failed to adequately account for functional limitations in her RFC determination. Because the ALJ was not required to incorporate into the hypothetical question limitations she reasonably determined were not supported by the record, this argument fails for the reasons already articulated in this opinion. *See supra* Part IV(B)-(G). Next, Plaintiff argues that the ALJ failed to adequately clarify with the VE the duties of her past relevant work as an order clerk. (Doc. 24 at 22.) But to the extent Plaintiff alleges error in the ALJ's past-relevant-work determination, the Court need not

reach this issue. For as discussed below, even setting aside the ALJ's step-four finding, there is substantial evidence to support her alternative step-five finding.

At step five, the Commissioner had the burden to provide "evidence that demonstrates that other work exists in significant numbers in the national economy that [Plaintiff] can do, given [her] residual functional capacity and vocational factors." *See* 20 C.F.R. § 404.1560(c)(2). In meeting this burden, the ALJ was permitted to rely upon various information, including the *Dictionary of Occupational Titles* (4th ed. rev. 1991) ("DOT"), its companion publication, the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993) ("SCO"), and testimony from a VE. *See* 20 C.F.R. § 404.1566(d)-(e); *see also Kimes v. Comm'r, SSA*, 817 F. App'x 654, 658 (10th Cir. 2020) (recognizing the SCO as the companion publication to DOT that ALJ may consider at step five). Consistent with the VE's testimony, the ALJ determined that Plaintiff could perform the jobs of marker, for which there are approximately 226,000 jobs available nationally, routing clerk, for which there are approximately 104,000 jobs available nationally, and router, for which there are approximately 34,000 jobs available nationally. (AR 24; *see also* AR 53.) Plaintiff contends that conflicts exist between the jobs the VE identified and her RFC. (Doc. 24 at 24-26.)

The ALJ "has an affirmative responsibility to ask about any possible conflict between [any] VE . . . evidence and information provided in the DOT." SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000). "[I]f there is an apparent conflict between expert testimony and the DOT, the ALJ must 'obtain a reasonable explanation for the apparent conflict.'" *Valdez v. Kijakazi*, 20-cv-01263 RB/GJF, 2022 WL 683024, at *3 (D.N.M. Mar. 8, 2022) (quoting SSR 00-4p, 2000 WL 1898704, at *4); *see also Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999) ("[A]n ALJ must investigate and elicit a reasonable explanation for any conflict between the [DOT] and expert

testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability.").

Here, the VE testified that her findings were consistent with the information contained in the DOT[8] (*see* AR 54), and the ALJ found this to be the case in her decision (*see* AR 24). Plaintiff argues that the ALJ erred, not because she failed to elicit an explanation for conflicts between the vocational testimony and the DOT, but because she failed to clarify vocational testimony that was inconsistent with the Occupational Outlook Handbook ("OOH") and O*NET. (*See* Doc. 24 at 23-26.) The VE, for her part, did not make any direct reference to the OOH or to O*NET in her vocational testimony (*see* AR 51-56), and neither Plaintiff nor her counsel expressed any objections at the administrative hearing to the VE's methodology (*see* AR 51, 54-56).

Plaintiff's general position appears to be that information contained in the OOH and O*NET suggest that the jobs identified by the VE require abilities that exceed those assessed in her RFC. (*See* Doc. 24 at 24-26.) She submits, for instance, that the OOH indicates that a "Material Recording Clerk," which she cross-references to the DOT's position of "routing clerk," "may need to lift heavy items." (*Id*. at 25 (citing *Material Recording Clerks*, Occupational Outlook Handbook, https://www.bls.gov/ooh/office-and-administrative-support/material-recording-clerks.htm; *Shipping, Receiving, and Inventory Clark*, ONET, https://www.onetonline.org/link/summary/43-5071.00).) Because lifting heavy items is at odds with the requirements of light work, Plaintiff posits that the ALJ should have questioned the VE about this potential lifting-capacity discrepancy. (*Id*. (citing 20 C.F.R. § 404.1567).) The Commissioner does not dispute that any of the information

---

[8] The VE clarified that her testimony regarding an employer's tolerance of absences was not addressed by the DOT but was based instead upon her "experience and review of the professional literature." (AR 54.) She did not, however, describe this testimony as "inconsistent" with the DOT. (*See id*.)

presented by Plaintiff is in fact contained in the referenced sources but insists that Plaintiff's reliance on the OOH and O*NET is misplaced. (*See* Doc. 25 at 21-22.) The Court agrees.[9]

Granted, the Commissioner takes "administrative notice of reliable job information available from various governmental and other publications," including the OOH, which is published by the Bureau of Labor Statistics. 20 C.F.R. § 404.1566(d)(5); SSR 00-4p, 2000 WL 1898704, at *2. But Plaintiff has not identified any directive in agency regulations, agency rulings, or in case law, that an ALJ must obtain a reasonable explanation for an apparent conflict between vocational testimony and information contained in the OOH or O*NET. Indeed, the Court is aware of no authority suggesting that the duty to consider conflicts in vocational testimony extends to conflicts with these publications. *But see Moffit v. Berryhill*, No. 17-4015-JWL, 2018 WL 276770, at *6 (D. Kan. Jan. 3, 2018) (reasoning that agency rulings and case law "do not require the ALJ to resolve conflicts between VE testimony and . . . vocational publications or information" other than the DOT) (citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 158 (6th Cir. 2009)). The SSA has clarified that "[i]n making disability determinations, [it] rel[ies] primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1898704, at *2. Simply, as the primary written source for occupational information, ALJs are directed to consider whether a VE's testimony conflicts with the DOT. *See id*. The same cannot be said of the OOH or O*NET. The Court, therefore, rejects Plaintiff's arguments premised upon purported conflicts between vocational testimony and the OOH or O*NET.

---

[9] Plaintiff makes additional arguments regarding conflicts in the level of social interaction required for the enumerated jobs, which are premised on information found in O*NET. (*See* Doc. 24 at 25.) These arguments, which do not involve purported conflicts between the DOT and the VE's testimony, suffer the same fate as Plaintiff's argument as to the requirement to lift heavy items found in the OOH.

As to apparent conflicts with the DOT, Plaintiff does not identify any. (*See* Docs. 25 at 21-22; 26 at 11-12.) Nor could she. The DOT indicates that for each of the jobs the VE identified at step five, the lifting and carrying requirements are consistent with light work; stooping, kneeling, crouching, and crawling are "[n]ot [p]resent"; and interactions with people are "[n]ot [s]ignificant."[10] *See* Marker, DICOT 209.587-034, 1991 WL 671802; Routing Clerk, DICOT 222.687-022, 1991 WL 672133; Router, DICOT 222.587-038, 1991 WL 672123.

Having rejected Plaintiff's arguments premised upon information contained in the OOH and O*NET, the Court is satisfied that the ALJ applied the correct step-five legal standard and that the VE's testimony provides substantial support for the ALJ's step-five findings. The Court denies Plaintiff's motion as to her claims of error at steps four and five.

## V. CONCLUSION

Having conducted a thorough review of the administrative record, the Court concludes that the ALJ applied the correct legal standards and that her factual findings were supported by substantial evidence. Plaintiff's arguments to the contrary are not well-taken. Accordingly, Plaintiff's Motion to Reverse and Remand for Rehearing, with Supporting Memorandum (Doc. 24) is **DENIED**.

_____
**KIRTAN KHALSA**
**UNITED STATES MAGISTRATE JUDGE**

---

[10] As the Commissioner notes, the DOT rates the level of social interaction from zero to eight, with zero representing the most complex functions and eight representing the least complex. *See* DOT, App. B—*Explanation of Data, People, & Things*, 1991 WL 688701 (Jan. 1, 2016). The jobs of maker, routing clerk, and router are each rated at eight, and the DOT specifies that the extent of interaction is "Not Significant." *See* Marker, DICOT 209.587-034, 1991 WL 671802; Routing Clerk, DICOT 222.687-022, 1991 WL 672133; Router, DICOT 222.587-038, 1991 WL 672123.